NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0177n.06

Case No. 23-5381

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Apr 22, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| ESTEBAN AGUILAR-MEDINA, | ) | KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. After Esteban Aguilar-Medina pled guilty to drug and gun charges, the district court imposed a within-Guidelines sentence. Aguilar-Medina objects to that sentence. Finding no error, we affirm.

I.

During the summer of 2022, Lexington police identified Esteban Aguilar-Medina as a suspect in their narcotics investigation. In May, as part of that investigation, police intercepted two shipments of concealed cash from a Lexington, Kentucky address. Those packages listed either one of Aguilar-Medina's known aliases or a generic sender with a first name and last initial "A," and each was destined for California.

In June, several packages arrived at a Georgetown, Kentucky residence Aguilar-Medina was renting. The June packages were "similar to other packages" police intercepted around that time in many ways, including the state of origin—California. R. 66, Pg. ID 259.

Later, in July, officers intercepted another package bound for Aguilar-Medina. That package—also sent from California to his Georgetown address—listed generic names similar to the earlier packages and included one of his aliases. A narcotics dog alerted on the package, and officers searched it. Inside the box, pink, unicorn wrapping paper concealed roughly six pounds of a methamphetamine mixture. Officers attempted a controlled delivery with this package but were unsuccessful.

Finally, in early September, police learned that another package from California was headed to Aguilar-Medina's new address in Lexington. Officers intercepted the package and searched it. It contained over ten pounds of methamphetamine. Hoping to arrest Aguilar-Medina, police attempted another controlled delivery.

This time, they succeeded. When Aguilar-Medina retrieved the package, officers arrested him and searched his house. Inside, they found Aguilar-Medina's girlfriend, four children, and a large collection of drug-trafficking gear: two high-caliber rifles with high-capacity magazines, three handguns, ammunition, drug ledgers, plastic wrap, a vacuum sealer, and other distribution tools. Among the packaging equipment was the same pink, unicorn wrapping paper from the July shipment.

Using that evidence, the United States charged Aguilar-Medina with several drug and weapons crimes. Aguilar-Medina agreed to plead guilty to two of them: possessing methamphetamine with the intent to distribute and possessing a firearm in furtherance of drug trafficking. *See* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 924(c). While the United States ultimately

dismissed the charges for the July shipment, the presentence report (PSR) recommended including the six pounds of methamphetamine mixture from that shipment in Aguilar-Medina's total drug quantity calculation.

The district court agreed. After hearing corroborating testimony from a Lexington detective, the court adopted the PSR and concluded the July shipment was relevant conduct under the Sentencing Guidelines. So, over Aguilar-Medina's objection, it included those drugs in his total drug quantity. That inclusion increased his total offense level from 36 to 38. After giving Aguilar-Medina credit for acceptance of responsibility, the court sentenced him to a within-Guidelines 250 months' imprisonment. Aguilar-Medina now appeals the court's drug-quantity determination and his sentence's substantive reasonableness.

## II.

Aguilar-Medina raises two challenges to the July shipment's inclusion. First, he attacks the district court's factual finding that he was responsible for those drugs. Second, he argues the district court erred in concluding that the July shipment was sufficiently connected to his conviction conduct—the September shipment.

## A.

First, the responsibility finding. Before a sentencing court may consider uncharged drugs as "relevant conduct," the government must show the defendant is "more likely than not actually responsible" for those drugs. *United States v. Mosley*, 53 F.4th 947, 962 (6th Cir. 2022) (quoting *United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013)); *see* U.S.S.G. §§ 1B1.3(a)(2), 3D1.2(d). The district court here found that the government had made that showing. We won't disturb that finding unless we are firmly convinced it was erroneous. *United States v. Benton*, 957 F.3d 696, 700, 702 (6th Cir. 2020).

It wasn't. Ample evidence supported the district court's finding that Aguilar-Medina was responsible for the July shipment to Georgetown. The Georgetown property was rented in Aguilar-Medina's name, and the utilities were registered to his girlfriend. *Cf. United States v. Rodriguez*, 211 F. App'x 467, 468 (6th Cir. 2006) (per curiam). Additionally, the June packages had been shipped to the same Georgetown address. Finally, police found the same "very unusual children's paper" that wrapped the July shipment to Georgetown when they searched Aguilar-Medina's Lexington address in September. R. 66, Pg. ID 276. That unique identifier connects Aguilar-Medina to the July shipment even though, as Aguilar-Medina notes, that shipment's packaging differed in other respects from the September shipment. In short, the district court properly held Aguilar-Medina responsible for the July shipment.

Aguilar-Medina resists this conclusion on four bases: an insufficient connection between himself and the Georgetown address, packaging differences between the July and September shipments, the weight difference between those two shipments, and other trafficking investigations occurring concurrently with Aguilar-Medina's. For the reasons just stated, the first two are unavailing. The second two fare no better.

First, Aguilar-Medina argues that the shipments' size difference severs their connection. But it's hard to see why the packages' weights matter. Each package contained several pounds of the same drug mixture, shipped to the same individual, for the same purpose—distribution. The packages' weights are immaterial to the many other factors linking the two shipments.

Second, Aguilar-Medina notes that police were investigating other drug dealers while they were investigating him. That's both true and irrelevant. The July shipment was sent to Aguilar-Medina's residence, contained one of his aliases, and used the same wrapping paper that he stored

at his Lexington address. The existence of separate investigations into similar drug trafficking does not overcome these facts connecting the July shipment to Aguilar-Medina.

In sum, the district court didn't err in determining that Aguilar-Medina was likely responsible for the drugs shipped to his Georgetown address in July.

B.

Next, the relevant-conduct determination. After the district court found Aguilar-Medina responsible for the July drugs, it concluded that those drugs met the Guidelines' relevant-conduct standard.

The government can prove relevant conduct in two ways. First, it may show that the uncharged quantity was part of the same "common scheme or plan" as the charged offense. U.S.S.G. § 1B1.3(a)(2); *Benton*, 957 F.3d at 701. That means the charged and uncharged drugs must be "substantially connected to each other by at least one common factor," such as a "common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, application note 5(B)(i); *Benton*, 957 F.3d at 701. Alternatively, the government may show the drugs were part of "the same course of conduct," as demonstrated by the "similarity of the offenses," the "regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3(a)(2); U.S.S.G § 1B1.3, application note 5(B)(ii); *United States v. Amerson*, 886 F.3d 568, 574 (6th Cir. 2018).

Under either route, the government met its burden. The July shipment to Georgetown qualifies as relevant conduct.

Start with the "common scheme or plan." The government showed that the July and September shipments shared a common purpose: each distribution-level delivery furthered Aguilar-Medina's drug-trafficking operation. As the district court found, Aguilar-Medina was "engaging in large scale trafficking activities." R. 66, Pg. ID 283. It's easy to see why; Aguilar-

Medina possessed several pounds of methamphetamine, firearms, cash, and drug-processing equipment—all suggestive of a major operation. *See United States v. Ham*, 628 F.3d 801, 808 (6th Cir. 2011). Indeed, Aguilar-Medina's strategic delivery decisions underscore that purpose: when police intercepted the July shipment to his Georgetown address, Aguilar-Medina switched his base of operations to Lexington and received another distribution-level shipment there. Thus, each shipment furthered his purpose of large-scale drug trafficking.

Additionally, the two incidents reflect Aguilar-Medina's *modus operandi*. The July shipment used the same pink wrapping paper officers found when they searched Aguilar-Medina's Lexington residence in September. That paper indicates a specific trafficking method: disguising the drug shipments as gifts. Moreover, the July shipment, like every suspicious package the police tracked, connected to California. And the May and July shipments used either the same generic names or Aguilar-Medina's aliases. Thus, both shipments displayed Aguilar-Medina's *modus operandi*.

Next, for related reasons, the government has shown that the two drug shipments arose out of the same course of conduct. First, the offenses were similar. U.S.S.G § 1B1.3, application note 5(B)(ii). The unique wrapping paper police found at Aguilar-Medina's Lexington home adorned the July shipment sent to his Georgetown address. And both shipments contained distribution-level quantities of the same drug mixture. Next, the government showed repetition. *Id.* Several shipments to and from Aguilar-Medina—including the July and September shipments—bore indicia of narcotics trafficking. Finally, the time interval was short. *Id.* The total time between the charged and uncharged drug shipments was about a month and a half. That's less than half the duration we've previously said "cuts in favor of a course-of-conduct finding." *Amerson*, 886 F.3d

at 574 (three-and-a-half months). Thus, the July shipment was part of Aguilar-Medina's course of conduct in narcotics trafficking.

In sum, the district court didn't err when it included the July shipment as relevant conduct.

III.

Aguilar-Medina also argues his sentence was substantively unreasonable. To overcome the presumption of reasonableness accompanying his within-Guidelines sentence, he must show that the district court abused its discretion in applying the § 3553(a) factors. *United States v. Johnson*, 95 F.4th 404, 418 (6th Cir. 2024).

He can't. Aguilar-Medina argues that the district court failed to properly consider his minimal criminal history and "positive work history." Appellant Br. 16. The court, however, acknowledged both. It noted that the Guidelines already account for his limited criminal history by assigning him a score of zero, and the court recognized his capacity to obtain lawful employment. But it also highlighted Aguilar-Medina's deliberate choice to both reside in the United States illegally and forgo legitimate employment in favor of trafficking narcotics. More generally, the district court methodically weighed the § 3553(a) factors and imposed a within-Guidelines sentence. We decline Aguilar-Medina's invitation to reweigh those factors now. *See United States v. Pyles*, 904 F.3d 422, 426 (6th Cir. 2018).

\* \* \*

We affirm.