RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0129p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIE R. BENTON, JR.,

*Defendant-Appellant.*

> No. 19-3287

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:18-cr-00406-1—John R. Adams, District Judge.

Decided and Filed:  April 30, 2020

Before:  MOORE, McKEAGUE, and READLER, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Robert A. Dixon, Cleveland, Ohio, for Appellant.  Bryson N. Gillard, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

CHAD A. READLER, Circuit Judge.  Willie Benton was arrested after purchasing four kilograms of powder cocaine during a transaction in his home.  Benton later pleaded guilty to conspiring to possess with the intent to distribute and conspiring to distribute cocaine, a plea he does not contest.  But he does contest his sentence for that offense.  Benton asserts that the district court improperly calculated his Federal Sentencing Guidelines range by adding as "relevant conduct" to his underlying offense three kilograms of crack cocaine found in a safe in

his home.  *See* U.S.S.G. § 1B1.3(a)(2).  Benton likewise challenges the district court's imposition of a 260-month sentence as procedurally and substantively unreasonable.  Seeing no error in the proceedings below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

After a month of planning, Willie Benton and Armando Merida met at Benton's Akron-area home to complete a drug transaction.  Unfortunately for the two, they were not alone in that respect.  The DEA had been surveilling their actions.

The transaction itself was brief.  Upon parking in Benton's driveway, Merida went inside Benton's home carrying about four kilograms of powder cocaine.  Moments later, Merida exited the home and drove away.  Having observed the circumstances surrounding the transaction, DEA agents stopped and searched Merida's car.  At the same time, they executed a search warrant on Benton's home.  In Merida's car, agents found $94,190.  In Benton's home, they found the just-delivered four kilograms of powder cocaine.  They also found approximately three kilograms of crack cocaine in a safe in an upstairs bedroom, and a handgun lying nearby.

Benton was charged with conspiring to possess with the intent to distribute and conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), & 846 (Count 1); and with possessing cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A) (Count 2).  By agreement with the government, Benton pleaded guilty to Count 1 in exchange for the dismissal of Count 2.

The parties then turned their attention to sentencing.  The Presentence Report (or "PSR") calculated Benton's total offense level as 33.  Critical to that conclusion was the underlying drug quantity calculation.  The PSR added to the four kilograms of powder cocaine delivered by Merida the three kilograms of crack cocaine found in Benton's safe, which the PSR deemed to be "relevant conduct" under U.S.S.G. § 1B1.3(a)(2).  The PSR next assessed Benton a criminal history category of VI in view of his 30 criminal convictions, which included prior offenses for cocaine possession and trafficking.  Taking all of this together, the PSR calculated Benton's Guidelines range as 235 to 293 months.

Benton raised a number of objections to that calculation. Relevant here are his objections that: (1) his possession of the three kilograms of crack cocaine found in the safe upstairs should not have been considered "relevant conduct" under U.S.S.G. § 1B1.3(a)(2); (2) the district court should have granted him a downward departure because his criminal history category overrepresented the seriousness of his past crimes; and (3) he should not have received a considerably higher sentence than his co-defendant, Merida, who received 84 months of incarceration. The government, for its part, agreed with the findings of the PSR.

At Benton's sentencing hearing, the district court heard testimony from Keith Taggart, a forensic chemist employed by the Ohio Bureau of Criminal Identification. Taggart testified that all of the contraband seized by the police—both the four kilograms delivered by Merida and the three kilograms in the upstairs safe—contained detectable amounts of cocaine or cocaine base. The government also called Michael Gilbride, an Akron police officer detailed to the DEA's Cleveland field office at the time of Benton's arrest, who participated in the investigation of Benton. Gilbride testified that the crack cocaine recovered from the upstairs bedroom was highly adulterated. Nevertheless, Gilbride added that Benton was likely selling it, perhaps with little success, and that the three kilograms discovered in the safe were what remained from an earlier five-kilogram purchase made by Benton. For corroboration, Gilbride referenced a call to Benton surveilled by DEA wiretap. During the call, a woman in Cleveland complained to Benton about the poor quality of the cocaine Benton had sold her. Gilbride also confirmed that a firearm was recovered next to the safe in the upstairs bedroom.

At the close of testimony, the district court turned to Benton's objections to the PSR. Chief among them was Benton's objection to the computation of the drug quantity. Benton argued that the crack cocaine stored in the upstairs safe was "unsellable" "junk," meaning that he could not have possessed the crack cocaine with intent to distribute it. The government countered with evidence it had obtained through a wiretap which demonstrated that Benton had successfully sold roughly two kilograms of the so-called "junk" crack cocaine in the past. The district court sided with the government, finding that the crack cocaine was "[c]learly part of the course of conduct of the defendant." In so doing, the court observed that a "drug trafficker [who] does a poor job of cooking his crack and/or mixing his drugs" is not shielded from having

those drugs deemed "relevant for purposes of sentencing." The district court also rejected Benton's assertion that trafficking in one substance (here crack cocaine) is not relevant conduct in a prosecution for trafficking in another (powder cocaine).

Benton fared no better in his request for a downward departure based upon his criminal history assessment. Benton's criminal history included past cocaine possession and trafficking convictions, weapons convictions, numerous community control and probation violations, and a bevy of convictions for operating a vehicle under the influence and driving with a suspended license. Benton argued that this admittedly lengthy criminal history was nonetheless unworthy of category VI because seven of his twelve total criminal history points were assessed to misdemeanor—not felony—offenses. The government countered that category VI underrepresented Benton's criminal history, noting that Benton had several times been assessed no criminal history points for felony offenses, including his prior cocaine possession, cocaine trafficking, and weapons convictions. Citing this "extraordinary record of misdemeanor offenses, let alone felony convictions," the district court denied Benton a downward departure.

The district court also denied Benton's request for a sentence similar to the 84-month prison term imposed on Merida. Critical to the district court's conclusion were the stark differences between the two defendants, including Merida's very limited criminal record. Adopting the PSR's proposed Guidelines range of 235 to 293 months and following an analysis under 18 U.S.C. § 3553(a), the district court sentenced Benton to 260 months in prison.

On appeal, Benton argues that the sentence imposed by the district court is both procedurally and substantively unreasonable. We take up those arguments now.

## II. ANALYSIS

### A. Benton's Sentence Was Procedurally Reasonable.

*1. The Three Kilograms Of Crack Cocaine Were Properly Counted As Relevant Conduct.*

The heart of Benton's appeal is that his possession of three kilograms of crack cocaine was not "relevant conduct" for purposes of the Guidelines. U.S.S.G. § 1B1.3(a)(2). In a

nutshell, relevant conduct is criminal conduct not necessarily covered by the present indictment or plea that the Guidelines say may nevertheless be considered in computing the defendant's Guidelines offense level. *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003). In that it relates to the calculation of the proper Guidelines range, Benton's "relevant conduct" argument sounds in procedural reasonableness. To render a procedurally reasonable sentence, a district court must properly calculate that range, consider the § 3553(a) factors, rely on facts that are not clearly erroneous, and explain the sentence it ultimately selects. *United States v. Bradley*, 897 F.3d 779, 784 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). In reviewing sentencing proceedings, we examine the district court's factual findings for clear error, its application of the Guidelines to those facts *de novo*, and its ultimate sentencing determination for abuse of discretion. *United States v. Susany*, 893 F.3d 364, 366–67 (6th Cir. 2018).

A defendant's uncharged trafficking offense for one controlled substance can constitute relevant conduct when the defendant is sentenced for trafficking in another. *Gill*, 348 F.3d at 151 ("[T]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. *See* [U.S.S.G.] § 1B1.3(a)(2) (Relevant Conduct)." (quoting U.S.S.G. § 2D1.1, application note 12 (application note 5 to the same section in the current Guidelines))). For Benton, then, his uncharged instance of possession with intent to distribute crack cocaine constitutes "relevant conduct" if it is "part of the same course of conduct or common scheme or plan" as Benton's cocaine trafficking offense. U.S.S.G. §§ 1B1.3(a)(2) & 3D1.2. In accordance with § 1B1.3(a)(2)'s plain language and its application notes, we have previously read that section as articulating two alternative grounds upon which an offense can qualify as "relevant conduct." The first is where the offenses are "part of a common scheme or plan," which requires a finding that the offenses are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *United States v. Phillips*, 516 F.3d 479, 483 (6th Cir. 2008) (quoting U.S.S.G. § 1B1.3, application note 9(A)). The second is where the offenses are "part of the same course of conduct" because they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* (quoting U.S.S.G. § 1B1.3, application note 9(B)).

Benton challenges neither this legal standard nor the fact that he possessed three kilograms of crack cocaine.  He instead makes a more nuanced argument tailored to the facts.  Benton claims that he could not have intended to distribute the crack cocaine because it was unsellable "junk."  For that reason, Benton says, his possession of the crack cocaine was not part of the same scheme or course of conduct as his possession of the more marketable powder cocaine.

Benton's framing of the issue, however, erroneously focuses on what might (or might not) have occurred as a result of his conduct, rather than his intent underlying that conduct.  That is clear from the offense's elements.  "[T]he elements of possession with intent to distribute" include "(1) knowingly or intentionally, (2) possessing, (3) *with the intent to distribute*, (4) a controlled substance."  *United States v. Buchanan*, 933 F.3d 501, 510 (6th Cir. 2019) (emphasis added) (citation and internal quotation marks omitted).  For the "intent to distribute" element, distribution is defined broadly to include, among other things, sales.  *United States v. Moore*, 423 F. App'x 495, 500 n.2 (6th Cir. 2011) (citing *United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995)).  With these concepts in mind, the question is thus not whether Benton *could sell* the crack cocaine at the time it was seized, but whether he *intended to sell* (and thereby distribute) that crack cocaine.  Whether a sale could actually come to fruition turns on a variety of factors, including price, quantity, quality, and opportunity.  *See Food Lion, LLC v. Dean Foods Co. (In re Se. Milk Antitr. Litig.)*, 739 F.3d 262, 279 (6th Cir. 2014) (discussing the effect of price, supply, and demand on market behaviors).  But whether Benton intended to sell the crack cocaine turns only on Benton's mental state.  *See United States v. Price*, 134 F.3d 340, 351 (6th Cir. 1998) (explaining that a conviction for possession with intent to distribute a controlled substance requires a showing of subjective intent to distribute narcotics).  In other words, even if Benton could not sell the crack cocaine on the terms he had hoped due to its low quality, that does not preclude a finding that he intended to do so, and thus intended to distribute a controlled substance.  *United States v. Woods*, 61 F.3d 904, 1995 WL 428334, at *3 (6th Cir. 1995) (table decision) (holding that the district court did not clearly err in finding the defendant intended to sell marijuana despite the defendant's argument that the marijuana "wasn't any good" and "would be almost impossible to sell").

Whether Benton intended to sell the crack cocaine is a factual matter that we review only for clear error. *United States v. Henry*, 819 F.3d 856, 864 (6th Cir. 2016). And we see no such error in the district court's finding that Benton did intend to do so, particularly in view of the preponderance-of-the-evidence standard applicable in sentencing proceedings. *United States v. Shannon*, 803 F.3d 778, 788 (6th Cir. 2015). Wiretap evidence admitted through witness testimony revealed that Benton had been trafficking cocaine in the months leading up to his arrest. Testimony also revealed that Benton had three kilograms of crack cocaine, an amount inconsistent with personal use. Benton kept that crack cocaine, which he alleged was unsellable, in a locked safe next to a firearm. Benton admitted at sentencing that he had been dealing in powder cocaine, and that the crack cocaine remained in his safe for "years" because the person who sold it to him "was supposed to fix" the crack—apparently so that Benton could later sell it. This collection of evidence hardly leaves us with a "definite and firm conviction" that the district court was wrong about Benton's intentions. *Id.* at 787 (quoting *United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007)).

Benton takes issue with some apparent confusion by the district court at sentencing as to whether the DEA wiretaps provided evidence that Benton was trafficking in powder or crack cocaine. True, at one point during the hearing, the district court appears to have incorrectly stated that a transaction captured on the wiretap involved the sale of crack, rather than powder, cocaine. Though the district court later corrected any misunderstanding, Benton claims that this sequence of events nevertheless infected the district court's factual findings because the court corrected itself only after overruling Benton's relevant conduct objection. But the district court, to its credit, took the issue head on. It noted its prior misunderstanding, and then, on the proper record, simply declined to change its mind that Benton intended to sell the three kilograms of crack cocaine because his prior transactions involved "cocaine of some form."

With the benefit of the district court's factual finding that Benton intended to sell the crack cocaine, Benton's possession of that substance easily qualifies as relevant conduct as to his powder cocaine conviction under either avenue set forth in U.S.S.G. § 1B1.3's application notes. Start with the requirement that the offenses be "part of a common scheme or plan." Here, the two offenses were "substantially connected to each other by at least one common factor, such as

common victims, common accomplices, common purpose, or similar *modus operandi*." *Phillips*, 516 F.3d at 483 (quoting U.S.S.G. § 1B1.3, application note 9(A)). While Benton may have bought the crack and powder cocaine from different suppliers and sold the two drugs to a different clientele, Benton's purpose for committing the two offenses and his *modus operandi* in doing so were identical. Benton sold drugs for a living. He bought, stored, and sold those drugs while operating out of the same home. And he guarded the drugs with the same safe and gun. For the same reasons, Benton's possession of the crack and powder cocaine are also "part of the same course of conduct" because they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* (quoting U.S.S.G. § 1B1.3, application note 9(B)). Benton's simultaneous possession and sale of crack and powder cocaine over several years is a paradigmatic example of ongoing criminal conduct.

For purposes of the Guidelines, conduct is not unrelated, moreover, simply because it involves trafficking in a different substance, or because the purportedly related activity occurs at different times. In *Phillips*, we found that the defendant's three instances of possession of a firearm *years apart* were relevant conduct under § 1B1.3. *Id.* at 484. In so finding, we distinguished our prior holding in *United States v. Hill* that, "[g]enerally, where two isolated drug transactions are separated by more than one year, a 'relevant conduct' finding may not be premised on the sole similarity that both transactions involved the same type of drug." 79 F.3d 1477, 1484 (6th Cir. 1996). We did so by emphasizing the consistency and similarity between Phillips's three offenses, as opposed to the lack of consistency and similarity in Hill's two. *Phillips*, 516 F.3d at 484–85. In that sense, Benton's conduct is more akin to that in *Phillips*— Benton's possession of crack and powder cocaine were simultaneous, not years apart, and Benton trafficked both substances out of the same home, for the same purpose, and with the same tools of the trade. To conclude otherwise would make it exceedingly difficult ever to consider a defendant's uncharged trafficking in a controlled substance in computing his offense level for trafficking in another, a result that is plainly inconsistent with the Guidelines. *See Gill*, 348 F.3d at 151. We thus see no error in the district court's determination as to relevant conduct.

*2. Benton's Sentence Was Otherwise Procedurally Reasonable.*

Benton also takes issue with the district court's perceived overemphasis of the Guidelines range in setting his sentence. To Benton's eye, his sentencing hearing "had the look and feel of a sentencing proceeding held before the landscape of sentencing was modified post-*Booker*," which made the Guidelines range advisory. *United States v. Booker*, 543 U.S. 220 (2005). Benton principally faults the district court for overemphasizing his criminal history, which the PSR placed in the maximum category of VI. But the record belies his claim. The district court discussed in detail Benton's crime, history, and characteristics as well as the need to deter Benton from future crime, the need to protect the public, and the possibility that a lengthy sentence might rehabilitate him. Those items were particularly relevant in answering Benton's objection that Merida received a much lower sentence. In so doing, the district court emphasized the key differences between the two men, including their respective crimes and criminal histories. Further, before passing sentence, the district court referred to the Guidelines as advisory several times. And having done all that, the district court was "tempted to," but ultimately did not, "impose a sentence outside of the [G]uidelines" range based on the information presented.

There was good reason for the district court repeatedly to discuss Benton's criminal history in passing sentence. The court rightly noted that Benton's record reflected a life-long disregard for the law, a pattern of conduct enabled by the repeated "slap[s] on the wrist" Benton received for serious conduct. And Benton failed to abide by even those minor punishments, repeatedly violating his probation and community control and driving on a suspended license after his numerous OVI convictions. At one point, the district court even fairly wondered whether Benton "[would] ever find his way to comply with even the basic laws of the state, laws of the country." The district court's discussion of Benton's criminal history touched on each of the § 3553(a) factors. That Benton's criminal history was his most prominent characteristic at sentencing is merely a reflection of his recidivist conduct. His sentence was procedurally reasonable. *See United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

**B. Benton's Sentence Was Substantively Reasonable.**

Benton also argues that his 260-month sentence was substantively unreasonable. Unlike challenges predicated on procedural grounds, where our focus is on the manner in which a sentence was calculated, substantive challenges focus on the length of the sentence itself. *United States v. Clayton*, 937 F.3d 630, 642–44 (6th Cir. 2019). And thus unlike reviewing a mechanical calculation of the Guidelines range, we instead have before us more intangible considerations. For passing sentence is more art than science, and one that reasonable jurists undertake in diverse ways. *Rayyan*, 885 F.3d at 442. We accordingly afford significant deference to a district court's balancing of the § 3553(a) factors—particularly where, as here, the sentence falls within the Guidelines range. *United States v. Faulkner*, 926 F.3d 266, 273 (6th Cir. 2019); *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc).

No abuse of discretion occurred. As the evidence presented at sentencing reflected, Benton is a career criminal who regrettably broke the law as a matter of course. Whether it was possessing, abusing, or trafficking drugs, carrying weapons while on probation, driving under the influence, or domestic violence, crime was Benton's lifestyle. Add to that Benton's present offenses. Benton possessed with intent to distribute four kilograms of powder cocaine with an additional three kilograms of crack cocaine and a firearm upstairs, despite his well-established status as a felon. Those offenses, serious in their own right, were nonetheless just part of an ongoing criminal enterprise that filled Benton's pockets while harming his community. And despite that history of misconduct, in many respects, Benton, as the prosecutor described things, had never received more than "a slap on the wrist." We thus see no abuse of discretion in the 260-month sentence imposed by the district court.

## III. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.