RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

FREDDIE A. KNIPP, JR.,

*Defendant-Appellant*.

No. 24-5579

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Ashland.
No. 22-cr-00011-1—David L. Bunning, District Judge.

Argued: March 20, 2025

Decided and Filed: May 19, 2025

Before: GIBBONS, LARSEN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Michael R. Mazzoli, COX & MAZZOLI PLLC, Louisville, Kentucky, for Appellant. Andrew E. Smith, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Michael R. Mazzoli, COX & MAZZOLI PLLC, Louisville, Kentucky, for Appellant. Charles P. Wisdom, Jr., Amanda Harris Huang, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

LARSEN, Circuit Judge. Freddie Knipp, Jr., sold methamphetamine on two occasions to a friend. He also bought a gun for that same friend, knowing he was a felon. For this, Knipp was convicted of two counts of distributing a controlled substance and one count of knowingly selling or disposing of a firearm to a felon. The district court sentenced him to 138 months'

imprisonment. Knipp appeals his conviction and sentence. For the following reasons, we AFFIRM.

I.

In 2019, the Kentucky State Police conducted a string of controlled purchases of methamphetamine from Larry Eldridge. In the final controlled meth buy, a police informant also purchased a firearm from Eldridge. That August, the State police obtained a search warrant for Eldridge's home and enlisted the help of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) in the search. The search uncovered firearms, explosives, large sums of cash, and roughly four ounces of methamphetamine. Eldridge informed the officers that Freddie Knipp, Jr., had supplied him with the methamphetamine.

The State charged Eldridge and placed him in custody. While in custody, Eldridge indicated his willingness to cooperate. In ensuing interviews, Eldridge again informed law enforcement that Knipp was his methamphetamine supplier. And he agreed to make controlled buys from Knipp as a confidential informant. To facilitate this, the State released Eldridge on bond in late October 2019.

Knipp and Eldridge spoke twice in the weeks following Eldridge's release, once over Facebook Messenger and once in person. On November 25, Knipp again reached out to Eldridge over Facebook, telling him, "I have you a couple of things you asked me about." R. 109, Trial Tr., PageID 762. Eldridge responded, "The toys or other?" *Id.* Knipp replied, "Both." *Id.* At trial, Eldridge testified that this referenced guns and drugs. Eldridge shared screenshots of the Facebook messages with ATF agents.

On December 10, 2019, and January 9, 2020, Eldridge conducted controlled drug buys from Knipp. In each instance, he purchased around one ounce of meth and surrendered the drugs to law enforcement.

On January 18, 2020, Eldridge and Knipp attended a gun show. Law enforcement officials had facilitated the trip to see whether Knipp would purchase a firearm for Eldridge, whom Knipp knew to be a convicted felon. At the gun show, Eldridge showed Knipp the gun he

wanted.  He then gave Knipp $500.  Knipp purchased the gun for $375 and, with Eldridge's permission, kept the difference.  Before the two men left the gun show, Knipp gave Eldridge the firearm.

In June 2022, a federal grand jury indicted Knipp on three counts.  Counts one and two charged distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1)—one for the drug sale on December 10, 2019, and one for the drug sale on January 9, 2020.  Count three charged knowingly selling or disposing of a firearm to a felon, in violation of 18 U.S.C. § 922(d)(1).  Knipp moved to dismiss the § 922(d)(1) charge, arguing that it violated the Second Amendment on its face.  The district court denied the motion.

Eldridge was separately indicted for numerous federal firearms, explosives, and drug crimes.  He pleaded guilty to three counts of either possessing or distributing methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and two counts of being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1).

Knipp, meanwhile, went to trial, and a jury convicted him on all counts.  The district court sentenced him to 138 months' imprisonment on counts one and two, and 120 months' imprisonment on count three, with all terms to run concurrently.  Knipp appeals.

II.

A.

Knipp first challenges the constitutionality of 18 U.S.C. § 922(d)(1).  Section 922(d)(1) criminalizes "sell[ing] or otherwise dispos[ing] of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person . . . is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."  18 U.S.C. § 922(d)(1).  Knipp contends that acquiring a firearm is a "necessary corollary" to an individual's Second Amendment right to keep and bear arms.  Appellant Br. at

Because § 922(d)(1) effectively prohibits felons, like Eldridge, from obtaining firearms, Knipp says the statute violates the Second Amendment.**[1]**

The Second Amendment protects the individual right "to keep and bear Arms." U.S. Const. amend. II; *see District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Supreme Court has established a two-step framework for analyzing Second Amendment challenges to firearm regulations. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). At the first step, courts look to the Amendment's plain text. If the text covers an individual's conduct, the Amendment presumptively protects that conduct. *Id.* At the second step, the government must show that the challenged regulation is "'relevantly similar' to laws that our tradition is understood to permit." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 29). If the government can make such a showing, the regulation stands; if not, it fails. *Bruen*, 597 U.S. at 24.

i.

We first consider Knipp's facial challenge to § 922(d)(1).**[2]** A facial challenge is the "most difficult challenge to mount successfully," as it requires a defendant to establish that the statute would not be valid under any circumstances. *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

---

**[1]**Based on Knipp's framing of the argument, we understand him to challenge § 922(d)(1) for infringing on felons' Second Amendment rights—not his own. Ordinarily, of course, a person may not challenge a law "to vindicate the constitutional rights of some third party." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208 (6th Cir. 2011) (quoting *Barrows v. Jackson*, 346 U.S. 249, 255 (1953)). So one might wonder whether Knipp is a proper plaintiff to contest the validity of § 922(d)(1). Several courts have concluded that firearms sellers can bring "derivative" claims based on the Second Amendment rights of their potential customers. *See Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) (per curiam) (collecting cases). Whatever the merits of these cases, they have no bearing here: We do not doubt Knipp's Article III standing. Knipp's "incarceration . . . constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction." *Bond v. United States*, 564 U.S. 211, 217 (2011) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). Any questions reside in the doctrine of "third-party standing," which the Supreme Court has denoted prudential. *June Med. Servs. L. L. C. v. Russo*, 591 U.S. 299, 316–17 (2020), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022); *id.* at 354 n.4 (Roberts, C.J., concurring in the judgment). *But see id.* at 364 (Thomas, J., dissenting) ("The rule against third-party standing is constitutional, not prudential."). Prudential standing doctrines, including this one, can be forfeited. *Id.* at 317. And the government has not raised a third-party standing challenge here.

**[2]**In *United States v. Bacon*, 884 F.3d 605, 611–12 (6th Cir. 2018), this court rejected a Second Amendment challenge to § 922(d)(1) on plain-error review. It's unclear whether the panel in *Bacon* determined that there was no error, or whether any error wasn't obvious. *See id.* Regardless, pre-*Bruen* precedent, like *Bacon*, is no longer binding. *United States v. Williams*, 113 F.4th 637, 647–48 (6th Cir. 2024). So *Bacon* does not decide this case.

Under *Bruen*'s framework, we first ask whether the Second Amendment's text covers the conduct at issue.  The Second Amendment reads:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  Principally, the Amendment protects "the right of the people to keep and bear Arms."  *Heller*, 554 U.S. at 576–77.  Section 922(d)(1) forbids "sell[ing] or otherwise dispos[ing] of any firearm or ammunition" to a known felon.  18 U.S.C. § 922(d)(1).

Felons are part of "the people" to whom the Second Amendment applies.  *United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024).  And the parties don't dispute that the firearm Knipp transferred to Eldridge is a weapon "in common use" today.  *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).  So, the question boils down to whether the right to "keep and bear Arms" covers the right to acquire them.

On its face, the Second Amendment does not speak to the acquisition of firearms, only to their "keep[ing]" and "bear[ing]."  But that doesn't mean that the Amendment's text doesn't *cover* such conduct.  In *United States v. Gore*, we concluded that the Second Amendment covered "[r]eceiving a firearm" because a gun's receipt "is a logical antecedent to [its] 'keep[ing].'"  118 F.4th 808, 813 (6th Cir. 2024) (third alteration in original).  Other circuits agree. *See Teixeira v. County of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (observing that the Second Amendment would have little meaning if individuals couldn't acquire firearms); *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 127 F.4th 583, 590 (5th Cir. 2025) ("[T]he right to 'keep and bear arms' surely implies the right to purchase them."); *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023) (per curiam) ("A State cannot circumvent [Second Amendment doctrine] by banning outright the sale or transfer of common-use weapons and necessary ammunition.").  *But see Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 104–05, 127–28 (10th Cir. 2024) (holding that a law barring persons under the age of twenty-one from purchasing firearms does not implicate the plain text of the Second Amendment).  That conclusion is consistent with the recognition by this and other circuits that, at *Bruen*'s first step, the Second Amendment protects "necessary corollaries" to keeping and bearing arms.  *See, e.g.*, *Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1192 (6th Cir. 2024) (recognizing the right to engage in firearm training); *Reese*, 127 F.4th at 590 (recognizing the

right to purchase firearms).  Thus, although the Second Amendment's text does not spell out the right to obtain firearms, it nonetheless "covers" that right.

Because the Second Amendment's text presumptively protects the act of selling or transferring a firearm to a felon, we must determine whether the government has nevertheless established that § 922(d)(1) sufficiently resembles other firearm regulations historically permitted in this country.  This court's decision in *Williams* provides the answer.  In *Williams*, this court marshalled mounds of historical evidence showing Congress's power to disarm individuals or groups it deems dangerous.   113 F.4th at 650–57.   We concluded that § 922(g)(1)—which criminalizes possession of firearms by felons—"is an attempt to do just that."  *Id.* at 657.  So, we deemed the statute facially constitutional.  *Id.*; *see also United States v. Goins*, 118 F.4th 794, 798–803 (6th Cir. 2024) (recounting our Nation's longstanding tradition of disarming dangerous persons and denying the defendant's § 922(g)(1) as-applied challenge).

*Williams*' reasoning applies with equal force to Knipp's facial challenge to § 922(d)(1). The Second Amendment protects the right to acquire a firearm only when necessary to enable the acquirer to possess or carry one.  So the right to acquire is limited by lawful constraints on the right to possess.  Because this circuit has upheld the federal felon-in-possession law against facial attack, Knipp's facial challenge to § 922(d)(1) likewise fails.

ii.

Generously read, Knipp's appellate brief might be taken to raise an as-applied challenge to § 922(d)(1) as well.  He briefly contends that there's no historical analogue for § 922(d)(1)'s criminalization of transferring a firearm to someone like Eldridge, whose felony conviction was for failure to pay child support.  But Knipp did not raise this argument before the district court, so we review it for plain error.  *United States v. Mahbub*, 818 F.3d 213, 223 (6th Cir. 2016).

"A lack of binding case law that answers the question presented will . . . preclude our finding of plain error."  *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015).  That principle applies here.   Neither the Supreme Court nor this circuit has decided whether § 922(d)(1) is unconstitutional when it bans firearm transfers to those convicted of failing to pay child support or to nonviolent felons more generally.  *See United States v. Sanches*, 86 F.4th 680,

687 (5th Cir. 2023) (per curiam) ("There is no binding precedent holding § 922(d)(1) unconstitutional, and it is unclear that *Bruen* dictates such a result . . . ." (citations omitted)). In fact, neither the Supreme Court nor this court has decided whether a person who committed a nonviolent felony has a constitutional right to *possess* a firearm. In *Williams*, we called that question "more difficult," while noting that it remains open in this circuit. *See* 113 F.4th at 663; *cf. United States v. Burrell*, 114 F.4th 537, 549 (6th Cir. 2024) (noting that any constitutional challenge to § 922(g)(1) could not survive plain-error review). Because no binding caselaw dictates the unconstitutionality of applying § 922(d)(1) to Knipp's case, the district court did not plainly err in denying Knipp's motion to dismiss the charge.

B.

Knipp also challenges the district court's decision to permit Eldridge to testify regarding his methamphetamine transactions with Knipp that predated the December 2019 and January 2020 offenses of conviction. At trial, Eldridge testified that Knipp had introduced him to meth in August 2018 and that, for a year after, he bought four or five ounces of the drug from Knipp weekly. Knipp argued that evidence of those sales should be excluded as impermissible propensity evidence under Federal Rule of Evidence 404(b). The district court disagreed, permitting the testimony as *res gestae*, or "background" evidence. We review a district court's evidentiary ruling for abuse of discretion. *United States v. Brown*, 888 F.3d 829, 835 (6th Cir. 2018).

Rule 404(b) generally prohibits using "[e]vidence of any other crime, wrong or act . . . to prove a person's character in order to show" that he acted in accordance with his character on a specific occasion. Fed. R. Evid. 404(b)(1). *Res gestae* evidence, however, lies beyond the rule's purview. *United States v. Johnson*, 95 F.4th 404, 417 (6th Cir. 2024). Permissible *res gestae* evidence concerns acts that are "inextricably intertwined with the charged offense," *id.* (quoting *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015)), and have "a causal, temporal[,] or spatial connection with the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). Knipp argues that the prior drug sales were too distant in time, and too different in quantity and delivery method, to be proper background evidence.

We need not decide whether the district court erred by admitting evidence of the prior drug sales because any error was harmless. *See* Fed. R. Crim. P. 52(a) (stating that errors "not affect[ing] substantial rights must be disregarded"). Evidentiary errors are harmless when the record "provide[s] us with 'fair assurance' that the verdict was not 'substantially swayed' by the error." *United States v. Kettles*, 970 F.3d 637, 643 (6th Cir. 2020) (emphasis omitted) (quoting *United States v. Chavez*, 951 F.3d 349, 358 (6th Cir. 2020)). And our review of the record here provides the needed assurance.

The jury was presented with Facebook messages and monitored drug transactions between Eldridge and Knipp that convincingly show that Knipp sold meth to Eldridge in December 2019 and January 2020. Knipp messaged Eldridge on Facebook in late November saying that he had the "toys or the other" for Eldridge, which Eldridge testified meant "[g]uns or the drugs." R. 108, Trial Tr., PageID 702–03. Six to eight agents monitored the ensuing controlled drug buys. During the first transaction, ATF Agent McComas observed Knipp in Knipp's 2002 Dodge Durango; he then saw the same vehicle being used in the second transaction. Prior to his controlled-buy meetings with Knipp, Eldridge had no drugs on his person or in his vehicle, yet he came back with about an ounce of meth each time. The jury even saw video recordings (albeit of poor quality) of the drug transactions themselves, and Agent McComas identified Knipp in the video of the second transaction. This incriminating evidence assures us that Eldridge's testimony about the earlier drug deals did not "substantially sway" the jury's verdict.

C.

Lastly, Knipp alleges that the district court committed procedural error when calculating his sentence. He contests the district court's decision to credit Eldridge's testimony regarding the drugs Knipp sold to Eldridge prior to December 2019 and to include those purchases in its drug-quantity calculation for sentencing purposes. Including the purchases significantly increased Knipp's base offense level for his § 841(a)(1) convictions. We review a district court's factual findings at sentencing for clear error and its application of the Sentencing Guidelines de novo. *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003).

Under the Sentencing Guidelines, a crime's base offense level stems from a defendant's "relevant conduct," as defined by U.S.S.G. § 1B1.3. *United States v. McReynolds*, 964 F.3d 555, 562 (6th Cir. 2020). As applicable here, "relevant conduct" encompasses acts that were "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see United States v. Hill*, 79 F.3d 1477, 1482 (6th Cir. 1996) (noting that § 1B1.3(a)(2) applies to drug offenses). If a sentencing court finds that the defendant's relevant conduct encompasses drug quantities greater than those present in the offense of conviction, the court may calculate the defendant's base offense level using the higher drug quantities. *McReynolds*, 964 F.3d at 562–63. The government must prove the drug quantity by a preponderance of the evidence. *United States v. Gardner*, 32 F.4th 504, 524 (6th Cir. 2022).

Here, the district court determined Knipp's base offense level to be 32. It based this calculation on: (1) Eldridge's two controlled meth purchases from Knipp; (2) Eldridge's admission in his plea agreement that he received four ounces of meth weekly from Knipp between November 2018 and August 2019;[3] and (3) Eldridge's testimony that the meth found at his home in August 2019 came from Knipp. Knipp objected to including any drug quantities outside the two controlled drug buys on the ground that Eldridge's testimony was unreliable. The court overruled his objection. Knipp now argues that the district court clearly erred by crediting Eldridge's representations that the prior drug buys occurred and calculating the quantities involved accordingly.

The district court based its drug-quantity calculation largely on Eldridge's plea deal and testimony, which the district court found credible. This court will not disturb a district court's credibility determination absent "a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Luck*, 852 F.3d 615, 623 (6th Cir. 2017) (quoting *United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014)).

Knipp offers three reasons why we should question the district court's credibility finding. None persuade. Knipp first argues that the drug-quantity stipulation in Eldridge's plea

---

[3]Eldridge testified at trial that his drug purchases from Knipp began in August 2018. His plea agreement, however, stated that the purchases began in November 2018. The district court relied on the date Eldridge provided in his plea deal to calculate the drug quantity.

agreement was unreliable since Eldridge could predict that he would be awarded a downward departure anyway due to his cooperation. But the Guidelines range is generally "the starting point and the initial benchmark" for any downward departure. *Gall v. United States*, 552 U.S. 38, 49 (2007). So, contrary to Knipp's suggestion, Eldridge exposed himself to a higher sentence when he stipulated to the earlier drug transactions with Knipp.

Knipp next posits that the difference in drug quantities Eldridge allegedly obtained from Knipp before August 2019—four ounces weekly—and after August 2019—one ounce per purchase—casts doubt on Eldridge's honesty. But as the government explained at the sentencing hearing, Eldridge was seeking only one ounce in the controlled buys because the ATF provided him with $500—the price of one ounce of meth. In fact, Knipp had expressed a willingness at one point to sell one pound of meth to Eldridge for $3,500, but the ATF would not fund such an expensive transaction. Lastly, Knipp points out that the government presented no evidence indicating that his lifestyle bore the hallmarks of someone prospering from large-quantity drug sales. Even if true, that claim alone is not enough for us to second-guess the district court's assessment of Eldridge's credibility.

\* \* \*

We AFFIRM.