NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0372n.06

Case No. 24-5469

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 25, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | TENNESSEE |
| JAYLEN SAIN, | ) | |
| Defendant - Appellant. | ) | OPINION |
| | ) | |

Before: COLE, GIBBONS, and BUSH, Circuit Judges.

GIBBONS, Circuit Judge. Jaylen Sain was arrested after officers found over a pound of marijuana, digital scales, baggies, and bundles of cash in his residence. Sain pleaded guilty to conspiring with the intent to distribute as well as possessing with the intent to distribute marijuana. The district court sentenced Sain to 50 months of imprisonment, below the Sentencing Guidelines range of 70 to 87 months. Sain appeals, arguing that the district court improperly calculated the Guidelines range. Seeing no error in the district court's calculation, we affirm.

I.

In 2019, officers began investigating a drug trafficking organization led by Caricus Hendrix in the Western District of Tennessee. Their investigation reached a turning point when, in early 2022, officers seized about 8,500 fentanyl pills and about 15 pounds of meth from the mail. The drugs were stashed in a so-called "dog food bucket," a large white cylinder container with a twist top, and headed to addresses in Bolivar and McNairy County, Tennessee. Officers determined

that these drugs were connected to Hendrix's drug trafficking organization and that the organization used dog food buckets to distribute drugs.

A few months later, in April 2022, officers interviewed a confidential source about Hendrix's drug trafficking organization. The source described two transactions. First, in May 2021, at Hendrix's direction, the source met Shannon Wilder at Sain's house at 109 Melbourne Drive in Bolivar, Tennessee. Wilder entered Sain's house and, after their meeting concluded, left with a dog food bucket full of meth. Wilder then took out a gallon-sized Ziplock bag containing about three to four ounces of meth and gave it to the source. The source, also on instructions from Hendrix, delivered the bag to another member of the organization.

Second, in June 2021, Hendrix instructed the confidential source to pick up another dog food bucket of meth and bring it to Sain's house. Once there, Sain took the meth into the kitchen to retrieve his share. Sain then gave the source a gallon-sized Ziplock bag containing about three to four ounces of meth. According to the source, these buckets contained more bags of meth, though the precise amount is unknown. The source then delivered the bag to another member of the organization, as instructed by Hendrix.

Relying on this information, officers obtained a wiretap on several members of the organization. The wiretap intercepted text messages and calls between Sain, Wilder, and Hendrix, concerning various drug trafficking activities, including the distribution of large amounts of marijuana.

After months of surveillance, in December 2022, officers executed a search warrant at Sain's house. They seized, among other things, over a pound of marijuana, three sets of digital scales, and bundles of cash.

In February 2023, a grand jury indicted Sain, along with 14 other defendants, for engaging in years-long conspiracies to distribute drugs. The indictment charged Sain with two marijuana offenses: conspiring to possess with the intent to distribute marijuana, 21 U.S.C. §§ 841(a)(1) and 846, and possessing with the intent to distribute marijuana, § 841(a)(1) and 18 U.S.C. § 2.

The district court released Sain on bond. A few months later, officers searched Sain's house and found about 88 grams of meth on a nightstand.

Sain later pleaded guilty to the marijuana charges in December 2023. The parties then turned their attention to sentencing. The Presentence Report ("PSR") determined that Sain's Guidelines range was 108 to 120 months.[1] That calculation was based, in part, on two findings. First, the PSR found that Sain was responsible for six ounces of meth based on the confidential source's statements. It then added that quantity as "relevant conduct" under U.S.S.G. § 1B1.3(a)(2). Second, the PSR found that Sain was storing and distributing drugs from his house and applied a two-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(12).

Sain objected to both findings at sentencing. As for the PSR's drug quantity determination, Sain argued that the six ounces of meth should not be attributed to him as "relevant conduct." The government insisted that the meth was "relevant conduct," but said it would present evidence for only three, rather than six, ounces of meth. The government then called FBI Task Force Officer, Christopher Burkeen, to testify. Burkeen testified that he met with the confidential source who described the two occasions in 2021 when the source went to Sain's residence and obtained a gallon-sized Ziplock bag of meth. Burkeen conservatively estimated that, based on these two

---

[1] Although the Guidelines range was initially 108 to 135 months, each of Sain's marijuana offenses carried a statutory maximum of five years, capping the range at 120 months. *See* 21 U.S.C. §§ 841(a)(1) and (b)(1)(D).

incidents, Sain was responsible for distributing about 30 pounds of marijuana and six ounces of meth.

Sain also testified at sentencing. Sain admitted that he had received "numerous" shipments of marijuana from Hendrix, that he paid Wilder for the shipments, and that he sold that marijuana to others. DE 417, Sent. Tr., Page ID 1246–47, 1258. Sain testified that Hendrix sent him meth one time but claimed that he had not asked Hendrix for the meth and never sold meth to anyone. Sain then explained that after he was released on bond, he started using drugs again. He believed that the meth found on his nightstand was cocaine, not meth, and said that he was keeping it for his personal use. According to Sain, he was a drug addict and had used "a series of drugs," which included meth. *Id.* at 1244.

After hearing from both parties, the district court determined that Sain was accountable for 30 pounds of marijuana and three ounces of meth. It based its determination of the quantity of meth on a laboratory report that confirmed officers seized about three ounces of meth from Sain's home during the April 2023 search.

The district court next addressed Sain's objection to the drug premises enhancement, noting that to apply this enhancement under the Guidelines, the use of a residence to store or distribute drugs need only be "one of the primary purposes." *Id.* at 1265. The district court found that based on Burkeen's testimony and the confidential source, "marijuana was being held at [Sain's] residence" and "individuals were coming and going from the residence to either deliver and/or purchase narcotics." *Id.*

The district court then determined that Sain's total offense level was 26. This level, combined with a criminal history category of II, produced a Guidelines range of 70 to 87 months. The government requested a below-Guidelines sentence of 60 months of imprisonment, while Sain

requested a lower, unspecified sentence.[2]  The district court ultimately varied downward and imposed a sentence of 50 months of imprisonment.  Sain filed this timely appeal.

## II.

Sain argues that his 50-month sentence is procedurally unreasonable for two reasons.  First, the district court improperly deemed three ounces of meth to be "relevant conduct."  U.S.S.G. § 1B1.3.  Second, the district court erroneously applied the drug-premises sentencing enhancement, finding that one of the primary uses of Sain's house was to manufacture or distribute a controlled substance.

## A.

Sain first contends that his possession of three ounces of meth was not "relevant conduct" for purposes of the Guidelines.  U.S.S.G. § 1B1.3(a)(2).  We review a district court's relevant-conduct determination, which involves the application of law to fact, de novo.  *United States v. Maken*, 510 F.3d 654, 657 (6th Cir.2007).  We review the district court's factual findings, however, for clear error.  *United States v. Reed*, 72 F.4th 174, 190 (6th Cir. 2023).  The government bears the burden of proving, by a preponderance of the evidence, that another offense is relevant conduct.  *United States v. Amerson*, 886 F.3d 568, 573 (6th Cir. 2018).

The Guidelines allow a district court to adjust a defendant's base offense level for unindicted, "relevant conduct."  U.S.S.G. § 1B1.3(a)(2); *United States v. Benton*, 957 F.3d 696, 700 (6th Cir. 2020).  Conduct is relevant when it is "part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).

---

[2] Although Sain requested "time served" in his sentencing memorandum, he did not seek a particular sentence during the sentencing hearing.  DE 374, Deft Sent. Mem., Page ID 867.

Sain's meth offenses were "part of the same course of conduct" as his marijuana offenses. *Id.* Offenses are part of the same course of conduct when "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* § 1B1.3, application note 5(B)(ii). Three factors guide our analysis of the connection between the offenses: "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Amerson*, 886 F.3d at 574 (quoting U.S.S.G. § 1B1.3, application note 5(B)(ii)).

*First*, there is regularity in Sain's drug offenses. Because every relevant conduct determination involves at least one other offense, we generally look for evidence of at least two other offenses. *Id.*; *see United States v. Hill*, 79 F.3d 1477, 1484 (6th Cir. 1996) ("Regularity is completely absent here, for the government proved only one prior offense."). The government offered evidence that Sain distributed meth on two separate occassions in 2021. It also offered undisputed evidence that Sain possessed about 88 grams of meth in April 2023, an amount the district court could have reasonably concluded was inconsistent with personal use. *See United States v. Hampton*, 769 F. App'x 308, 309 (6th Cir. 2019) (describing a "hit" of meth as "a quarter of a gram"). Given these three offenses, the government made a sufficient showing of regularity.

*Second*, the time interval between Sain's meth and marijuana offenses was short. Sain committed his first two meth offenses in May and June 2021 while he committed his marijuana offenses from June 2021 to February 2023. Sain's simultaneous possession and sale of meth and marijuana in June 2021 is "a paradigmatic example of ongoing criminal conduct." *Benton*, 957 F.3d at 703. Sain also committed his third meth offense in April 2023, only two months after his indictable conduct and well-within the "nine-month period" we have generally considered

sufficient to support a relevant-conduction determination. *Phillips*, 516 F.3d at 483–84 (citing cases).

*Third*, there is substantial similarity between Sain's meth and marijuana offenses. To start, a defendant's drug offense is not irrelevant just because it involves a different substance. *See Benton*, 957 F.3d at 703; *see also Hill*, 79 F.3d at 1484 ("Generally, where two isolated drug transactions are separated by more than one year, a 'relevant conduct' finding may not be premised on the sole similarity that both transactions involved the same type of drug."). We generally take a more holistic view, considering factors like whether the conduct occurred in the same place, involved the same actors, or shared a common purpose. *See Benton*, 957 F.3d at 703; *Phillips*, 516 F.3d at 485. These factors support a relevant-conduct finding here. Sain's 2021 meth offenses took place in the same place (Sain's house), between the same actors (Sain, Wilder, and the confidential source), and involved the same purpose (distributing drugs for Hendrix's drug trafficking organization) as his marijuana offenses. Indeed, Sain even testified that he had received meth from Hendrix one time and that he suspected it was because Hendrix wanted him to sell it. Sain's 2023 meth offense also took place in his house and likely shared a similar purpose (distributing drugs).

Given the regularity of Sain's drug activities, the close temporal proximity between his meth and marijuana offenses, and the substantial similarity between the two offenses, we see no error in the district court's relevant-conduct determination. Sain's possession of three ounces of meth was part of the same course of conduct as his marijuana offenses.

Sain argues that the record does not support the district court's relevant-conduct determination. He emphasizes that the confidential source's statements, as recounted by Burkeen, were uncorroborated and points to his own testimony, denying that he ever asked Hendrix for meth

or sold it to anyone. The government, however, did not need definitive proof to establish that Sain's meth possession was relevant conduct—merely a preponderance of the evidence. *See Amerson*, 886 F.3d at 573. And the district court did not commit clear error in finding the source's statements reliable and crediting Burkeen's testimony.[3] *See United States v. Knipp*, 138 F.4th 429, 437 (6th Cir. 2025) (explaining that a "district court's credibility determination" is generally left undisturbed).

Sain also claims that any meth he did possess was for his personal use. To be sure, if Sain did not intend to sell the meth, then his meth possession would not share a common purpose with his marijuana offenses. *See United States v. Buchanan*, 933 F.3d 501, 510 (6th Cir. 2019) ("[T]he elements of possession with intent to distribute are '(1) knowingly or intentionally, (2) possessing, (3) with the intent to distribute, (4) a controlled substance." (quotation omitted)). But whether Sain intended to sell meth is a factual matter that we review only for clear error. *Benton*, 957 F.3d

---

[3] Sain argues that the district court did not actually find the confidential source's statements reliable and instead based its decision solely on the April 2023 search. When the district court announced its ruling on the amount of meth attributable to Sain, it said that it was "basing that, quite frankly, on Exhibit 12." DE 417, Sent. Tr., Page ID 1264. That exhibit is a lab report, showing the precise amount of meth obtained from Sain's house during the April 2023 search. Sain claims that this means the district court's relevant-conduct determination was based on evidence obtained from the April 2023 search, but not the 2021 incidents.

We disagree. Although the district court appeared to rely on the lab report in determining the meth *quantity* attributable to Sain, it did not discount the confidential source's statements describing the 2021 incidents. To the contrary, when the district court announced its ruling on the drug-premises enhancement, it specifically relied on evidence from "confidential sources and from Officer Burkeen that individuals were coming and going from the residence to either deliver and/or purchase narcotics." DE 417, Sent. Tr., Page ID 1265. It would make no sense for the district court to find the confidential source reliable for purposes of the drug-premises enhancement, but not for purposes of its relevant-conduct determination. If the confidential source's statements describing drug transactions at Sain's house involving meth supported the district court's finding that he maintained a drug premises, then presumably they supported the district court's finding that he possessed three ounces of meth. The government's burden of proof—preponderance of the evidence—is the same in both cases. *See Amerson*, 886 F.3d at 573; *Howell*, 17 F.4th at 689.

at 702. And the district court did not clearly err by finding that Sain intended to sell the meth. As discussed above, the district court could have reasonably concluded that the 88 grams Sain possessed was inconsistent with personal use. *See Hampton*, 769 F. App'x at 309. The record simply does not leave us with a "definite and firm conviction" that the district court was wrong about Sain's intentions.[4] *United States v. Shannon*, 803 F.3d 778, 787 (6th Cir. 2015) (quotation omitted).

B.

Sain also argues that the district court improperly applied the drug-premises enhancement. *See* U.S.S.G. § 2D1.1(b)(12). The Guidelines instruct district courts to increase a defendant's base offense level by two levels "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." *Id.* The enhancement applies when the defendant "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson,* 737 F.3d 444, 447 (6th Cir. 2013). The government bears the burden to prove by a preponderance of the evidence that the enhancement applies. *See United States v. Howell*, 17 F.4th 673, 689 (6th Cir. 2021). We review the district court's factual findings supporting application of the drug-premises enhancement for clear error, but its legal interpretations de novo. *United States v. Terry*, 83 F.4th 1039, 1040–41

---

[4] The government argues that because Sain admitted he received two ounces of meth from Hendrix, it makes no difference whether he is responsible for three ounces of meth, as the district court determined, because the Guidelines range would be the same. But that Sain received two ounces of meth from Hendrix does not mean that his possession was "relevant conduct" under the Guidelines. U.S.S.G. § 1B1.3(a)(2). Determining whether conduct is relevant, as we have explained, requires considering several factors, including the defendant's purpose in engaging in that conduct. And we cannot discern Sain's purpose from the mere fact that he received two ounces of meth on one occasion. Thus, Sain's testimony, standing alone, is not enough to sustain the district court's relevant-conduct determination.

(6th Cir. 2023).

Sain does not dispute that he maintained the residence at 109 Melbourne. He argues instead that he did not maintain the residence for the *primary* purpose of distributing drugs. The drug-premises enhancement applies, however, when "*one of* the principal uses" of the residence is distributing or manufacturing illegal drugs. *United States v. Tripplet*, 112 F.4th 428, 432 (6th Cir. 2024) (emphasis added); *see* U.S.S.G. § 2D1.1, application note 17. It need not be the sole purpose of the premises. *Tripplet*, 112 F.4th at 432.

In applying the drug-premises enhancement, the district court found that "marijuana was being held at [Sain's] residence" and "individuals were coming and going from the residence to either deliver and/or purchase narcotics." DE 417, Sent. Tr., Page ID 1265. These factual findings were supported by the record. Several individuals involved in Hendrix's drug trafficking organization delivered and picked up drugs from Sain's house. The drugs were often contained in a "large dog food bucket," which Hendrix was known to use to transport illegal drugs. *Id.* at 1173; *see id.* at 1255–56. Sain also admitted that Hendrix dropped off marijuana "numerous, numerous" times and that he sold the marijuana. *Id.* at 1258. When officers searched Sain's residence in December 2022, they found over a pound of marijuana, digital scales, and bundles of cash.

These facts were also sufficient to justify application of the drug-premises enhancement. In determining whether a defendant used his home for the "principal purpose[]" of drug trafficking, evidence that the defendant stored and distributed drugs there "will usually suffice." *United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014) (emphasis omitted); *see United States v. Leggett*, 800 F. App'x 378, 381 (6th Cir. 2020). Sain did both. He used his house to store and distribute significant quantities of drugs over several years. The district court did not err in applying the drug-premises enhancement.

III.

For these reasons, we affirm the judgment of the district court.